Citation Nr: 1126155 
Decision Date: 07/12/11 Archive Date: 07/19/11

DOCKET NO. 95-12 322 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Fort Harrison, Montana


THE ISSUE

Entitlement to an effective date earlier than March 14, 2005, for the grant of a 100 percent disability rating for paranoid schizophrenia.


REPRESENTATION

Appellant represented by: Sean Kendall, Attorney


ATTORNEY FOR THE BOARD

D. Havelka, Counsel







INTRODUCTION

The Veteran had active military service from May 1942 to April 1943.

This matter initially came before the Board of Veterans' Appeals (Board) on appeal from a February 1995 rating decision of the Fort Harrison, Montana, Department of Veterans Affairs (VA) Medical and Regional Office Center (RO), which granted an increased disability rating for schizophrenia from a noncompensable (0%) rating to 30 percent, effective from September 30, 1994. 

A May 1998 rating decision further increased the disability rating from 30 percent to 50 percent, effective from September 30, 1994. The Veteran perfected an appeal as to the rating assigned. The Board issued a decision on March 11, 2002, that confirmed the denial of the assignment of a disability evaluation in excess of 50 percent for schizophrenia, paranoid type, and the appellant appealed that determination to the United States Court of Appeals for Veterans Claims (Court). In January 2004, the Court granted a Joint Motion for Remand and vacated the March 11, 2002, Board decision and remanded the case to the Board for readjudication and issuance of a new decision. The Board remanded the case for additional development in December 2004.

In December 2005, the RO issued a rating decision that increased the disability rating for the Veteran's service-connected schizophrenia from 50 percent to 100 percent, effective from March 14, 2005. This award is considered a full grant of the benefits that had been sought on the foregoing appeal. 

The Veteran disagreed and subsequently perfected an appeal as to the effective date of the award of the 100 percent disability rating.

In November 2007 the Board rendered a decision on the Veteran's claim for an earlier effective date for the grant of a 100 percent disability rating for schizophrenia. In August 2010 the Court vacated the Board's decision and remanded the case. 

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2010). 38 U.S.C.A. § 7107(a)(2) (West 2002).


FINDINGS OF FACT

1. In May 1944, the RO reduced the evaluation for the Veteran's psychiatric disorder, then characterized as dementia praecox, to 30 percent. It was further reduced to noncompensable in November 1948, as a recent examination had found the disorder to be in remission. The Veteran did not file a notice of disagreement within one year of having been provided notice of that decision, and it is now final.

2. In a May 1991 rating decision, the RO continued the noncompensable disability rating for the Veteran's psychiatric disorder, which was recharacterized as paranoid schizophrenia. The Veteran did not file a notice of disagreement within one year of having been provided notice of that decision, and it is now final.

3. The Veteran did not file another claim of entitlement to an increased disability evaluation for his service-connected psychiatric disorder until an informal claim for entitlement to an increased evaluation was received on September 30, 1994, and the RO granted an increased evaluation to 50 percent from that date.

4. In December 2005, the RO granted an increased evaluation from 50 percent to 100 percent for the Veteran's service-connected schizophrenia, effective from March 14, 2005.

5. Prior to March 14, 2005, the Veteran's service-connected schizophrenia, paranoid type, was productive of no more than mild impairment, and did not manifest the requisite symptomatology for a 100 percent schedular rating. That is, it was not shown prior to March 14, 2005 to be productive of severe impairment of social and industrial adaptability, active psychotic manifestations of such extent, severity, depth, persistence, or bizarreness, as to produce total social and industrial inadaptability; nor was it shown prior to March 14, 2005, to be productive of total occupational and social impairment due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name.

6. The Veteran's service-connected paranoid schizophrenia was not in and of itself shown to prevent him from securing and following substantially gainful employment prior to March 14, 2005.


CONCLUSION OF LAW

The criteria for an effective date prior to March 14, 2005, for the assignment of an increased evaluation of 100 percent for schizophrenia, paranoid type, have not been met or approximated. 38 U.S.C.A. §§ 1110, 1155, 5107, 5108, 5110, 7104, 7105 (West 2002 & Supp. 2010); 38 C.F.R. §§ 3.102, 3.159, 3.321, 3.400(q)(ii) (2010), 4.132, Diagnostic Code 9203 (effective prior to November 7, 1996); 38 C.F.R. §§ 3.102, 4.3, 4.130, Diagnostic Code 9203; 61 Fed. Reg. 52,695- 52,702 (Oct. 8, 1996) (effective November 7, 1996).


REASONS AND BASES FOR FINDINGS AND CONCLUSION

I. Notice and Assistance

Upon receipt of a complete or substantially complete application, VA must notify the claimant of the information and evidence not of record that is necessary to substantiate a claim, which information and evidence VA will obtain, and which information and evidence the claimant is expected to provide. 38 U.S.C.A. § 5103(a).

The notice requirements apply to all five elements of a service connection claim: 1) Veteran status; 2) existence of a disability; 3) a connection between the Veteran's service and the disability; 4) degree of disability; and 5) effective date of the disability. Dingess v. Nicholson, 19 Vet. App. 473 (2006).

The notice must be provided to a claimant before the initial unfavorable adjudication by the RO. Pelegrini v. Principi, 18 Vet. App.112 (2004).

The notice requirements may be satisfied if any errors in the timing or content of such notice are not prejudicial to the claimant. Mayfield v. Nicholson, 19 Vet. App. 103 (2005), rev'd on other grounds, 444 F.3d 1328 (Fed. Cir. 2006).

This appeal arises from the Veteran's disagreement with the effective date assigned following the grant of a 100 percent disability rating upon his claim for an increased disability rating for his service-connected schizophrenia. Courts have held that, once service connection is granted, and a disability rating and effective date are assigned, the claim is substantiated, additional notice is not required, and any defect in the notice is not prejudicial. Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). No additional discussion of the duty to notify is therefore required.

Nevertheless, the RO provided the appellant additional notice pertinent to the effective date issue on appeal by letters dated in May and July 2006. This notification substantially complied with the specificity requirements of Dingess v. Nicholson, 19 Vet. App. 473 (2006) and Quartuccio v. Principi, 16 Vet. App. 183 (2002), identifying the evidence necessary to substantiate a claim and the relative duties of VA and the claimant to obtain evidence; and Pelegrini v. Principi, 18 Vet. App. 112 (2004), requesting the claimant to provide evidence in his or her possession that pertains to the claims.

The appellant has neither alleged nor demonstrated any prejudice with regard to the content or timing of the notice. See Shinseki v. Sanders, 129 S.Ct. 1696 (2009) (Reversing prior case law imposing a presumption of prejudice on any notice deficiency, and clarifying that the burden of showing that an error is harmful, or prejudicial, normally falls upon the party attacking the agency's determination.); See also Mayfield v. Nicholson, 444 F.3d 1328, 1333-34 (Fed. Cir. 2006). The Veteran is represented by an attorney and as recently as May 2011, the attorney has indicated that the appellant does not have any additional evidence to submit. 

VA has obtained service medical records; obtained VA and private post-service medical records; assisted the appellant by affording him pertinent examinations; obtained a medical opinion as to the severity of the disability in question since the grant of service connection; and, afforded him the opportunity to present statements and evidence. The Veteran had previously presented testimony before the Board in relation to the previously adjudicated claim for an increased rating. He has indicated that he does not desire a hearing with respect to the present appeal for an earlier effective date for a 100 percent rating. All known and available records relevant to the issue on appeal have been obtained and associated with the claims file; and the appellant has not contended otherwise. As noted above, as recently as May 2001, the appellant's attorney indicated that no additional information or evidence was available or needed to be obtained.

VA has substantially complied with the notice and assistance requirements and the appellant is not prejudiced by a decision at this time.

II. Factual Background

Service treatment records reveal that Veteran was diagnosed with "dementia praecox" during active service. In its August 2010 decision, the Court defined dementia praecox as the "original name for schizophrenia when it was characterized as a psychosis with adolescent onset and a chronic course ending in deterioration." DORLAND"S ILLUSTRATED MEDICAL DICTIONARY 492 (31st ed. 2007).

A January 1943 Report of Medical Survey indicated that the Veteran attacked a shipmate with a monkey wrench, believing he was being persecuted, and that "they" were trying to steal his inventions. Examination revealed impulsive and unpredictable behavior, auditory and visual hallucinations, and that the Veteran claimed to be able to predict the future. Insight and judgment were absent, and memory, attention, and comprehension were found to be impaired. It was also noted that he was confused at times and disoriented, asocial, and preoccupied with his various inventions. It was concluded that the Veteran was "psychotic, a menace, and was in need of institutional care." He was determined to be unfit for service and was released. It was also indicated that the "[p]robable future duration" was permanent. The record indicates that the Veteran was discharged from service in April 1943.

In April 1943, the Veteran submitted a claim for compensation or pension. He reported recently being hospitalized at the United States Public Health Service. Another claim was submitted in December 1943.

In May 1943, the RO received a notice from the United States Public Health Service noting that the Veteran was discharged from their hospital in May 1943.

The RO subsequently received multiple letters documenting that the Veteran was hospitalized while he was still enlisted in the service.

In February 1944, the RO granted service connection for dementia praecox, with the assignment of a 70 percent disability rating, effective July 13, 1943. He was found to be incompetent. In May 1944, the RO reduced the evaluation for dementia praecox to 30 percent. It was further reduced to noncompensable in November 1948, as a recent examination had found the disorder to be in remission. The Veteran did not file a notice of disagreement with either of these decisions.

The above rating actions were based upon evidence contained in VA field examination reports dated December 1943 and May 1944 and a VA neuropsychiatric examination report dated January 1944. The evidence of the field examination reports established that the Veteran had difficulties in school, being below average in intelligence, had difficulty following the course of study, and that he was only passed along from grate to grade to keep him with his age contemporaries and keep him "off the streets." A December 1944 VA psychiatric examination report noted improvement in the Veteran since the acute psychotic episode during service and ultimately diagnosed the him with "dementia praecox, paranoid type, in remission, patient competent." 

In November 1985 the Veteran filed a claim on a VA form 21-526. Of note is the employment history indicated by the Veteran. He indicated a past history of employment as a store clerk in 1950 and that he worked 6 months yet had 2 years of time lost from illness. He further indicated that he was subsequently self-employed as a "prospector, mining & rocks." 

Pursuant to the 1985 claim for an increased rating, VA neuropsychiatric examination in January 1986 resulted in a diagnosis of "schizophrenia, paranoid type, in the past," with no evidence of psychosis, a good prognosis, and no social or industrial impairment. He was found to be competent. The examiner specifically noted that there was "no social or industrial impairment for this service-connected psychotic condition." Moreover the examination report noted that the Veteran reported an employment history of "prospected, cut rocks and worked as a store clerk. Patient has not worked full time except in the store job. He was last employed in 1970 , instead took care of his parents and the home since." The examination report also noted that the Veteran was happily married for the past 8 years to his second wife. 

Pursuant to a 1991 claim for an increased rating, VA psychiatric examination in May 1991 found the Veteran to be competent, with no evidence of psychosis, a good prognosis, and no social or industrial impairment. The examination report indicated that he was clean and reasonably tidy; that he sat quietly but responded appropriately to questions. The Veteran reported that his mood was cheerful most of the time. There was no evidence of psychomotor impairment. He reported being unemployed and that he would perform chores around the home and yard. He also reported an interest in rock hunting. When performing a task, he reported that he would have trouble concentrating when interrupted; however, he reported that he was not irritable and denied any weeping or suicidal ideation. No thought disorder or paranoid ideas were elicited. Self-image was described as good. Memory was intact. The conclusion was no evidence of psychosis at that time with no social and industrial impairment.

In a May 1991 rating decision, the RO continued the noncompensable disability rating for the Veteran's service-connected psychiatric disorder which was recharacterized as schizophrenia, paranoid type, to more accurately reflect the current diagnosis of his disability. He Veteran did not file a notice of disagreement within one year of having been provided notice of that decision.

On September 30, 1994, an informal claim for entitlement to an increased disability rating for schizophrenia was received.

In December 1994, the RO received a variety of lay statements as well as a copy of the May 1991 VA examination report which had been annotated by the Veteran's wife by inserting her own comments in red pen over the examination report, contending that the Veteran did have memory problems and that he could not even remember his personal hygiene. She further contended that he was 100 percent disabled.

Lay statements submitted at this time were from HEW (a cousin of the Veteran) and the Veteran's spouse. The statement dated November 1994 from HEW discussed the Veteran's mental condition during service and noted that he was unable to work and was totally supported by his parents following his medical discharge from the service.

The November 1994 dated statement from the Veteran's wife contended that the Veteran's memory and concentration were impaired since his discharge from the military. She contended that his ability to work was impaired and that he had been taken care of by his parents. She also contended that the Veteran's mental disorder had not been cured and that there was no cure for this disorder. In another statement she also contended that the Veteran's ability to relate to others was impaired; that he was unable to remember to take care of himself (including personal hygiene), fabricated stories and lied most of the time; was always in trouble with credit card debt; had memory problems and loss of concentration; would get mad at her for no reason at all; had sleeplessness; and had intermittent cold sweats and dizziness. Her statements also indicated that she married the Veteran in 1976 and that she married him not knowing that he had a mental disorder. 

In December 1994, the RO received a November 1994 private mental status evaluation report from Dr. R.T., Ed.D, N.C.C., L.P.C., C.C.M.H.C. During the evaluation, the Veteran reported that he had not worked in his lifetime. He also talked about some mining claims with which he had been involved. He was noted as talking in a very suspicious manner during this portion of the conversation. He indicated in general that he was suspicious of the government. He reported that his typical day started with his wife waking him up so that he could take her to work. He reported then going to the local bakery for coffee and donuts for two to three hours. He reported that he would generally keep to himself unless someone approached him. He reported studying his rock collection during the day, then picking his wife up from her job, if he remembered. During the evening he reported going to the local Town Pump Restaurant for a few hours then returning home to watch the news. He reported some problems with sleeping but rated it as a two out of three, with three being the most satisfying sleep. He also "listed" problems with memory, concentration, physical hygiene, and his temper at times.

The examiner noted that the Veteran spoke with a flat tone of voice in response to questions, showing no enthusiasm. He was deemed to be of average intelligence. While oriented in all spheres, it was noted that he seemed to lack concentration as the conversation continued. Remote and recent memory seemed to be impaired, and speech revealed some suspiciousness. It was thought that he seemed to exhibit a slight to moderate thought disorder. 

Dr. R.T. concluded that concentration skills seemed "extremely poor." He further found that the Veteran's physical hygiene had deteriorated significantly over the past few years "according to him and his wife." It was thought that the symptoms had increased drastically during the last year or two, and his ability to drive seemed impaired, although it was acknowledged that he continued to drive.

It was noted that the nature of the Veteran's psychiatric disorder was never fully explored in the past because he was basically untreated throughout his lifetime. Dr. R.T. concluded that the Veteran could benefit from medication for his "schizophrenic like condition." The diagnosis was undifferentiated schizophrenia.

In December 1994, the Veteran's spouse submitted another statement in which she essentially contended that the Veteran's mental condition warranted a higher evaluation.

In February 1995, a claim for a increased compensation based on unemployability was submitted. This document indicates "none" with respect to past employment and also indicates that the Veteran was last employed in 1947 in the "Army." The other evidence of record clearly establishes that the Veteran served in the Navy in 1942 and 1943. 

In May 1995, a hearing was conducted before an RO hearing officer. During the hearing it was contended, in pertinent part, that the Veteran's schizophrenia was active and had continued to be active for 50 years. It was specifically contended that the Veteran's schizophrenia was active because the Veteran had never worked and was never an active part of the society that he lived in. It was noted that the Veteran had not received psychiatric treatment, and the Veteran's spouse stated that she did not believe in medication. Thus, it was contended that the Veteran's condition had not gone into remission because he had never received treatment.

His wife testified that the Veteran had been unable to work since his release from the military because of his mental disability; needed regular aid and assistance; had poor personal hygiene; and behaved strangely and unpredictably. However, it has been established that the Veteran's wife married him in 1976, which was over three decades after he separated from service in 1943. The Veteran testified that he enjoyed sawing rocks and polishing rocks. He reported driving some to the grocery store and that they sometimes went to restaurants.

In April 1995, the RO received multiple lay statements. These statements discussed the Veteran's mental health and occupational history. Several of them opined, or indicated that the Veteran had never worked as an adult and that he was unable to work because of his mental condition.

In the April 1995 substantive appeal, the Veteran's wife reiterated many of her previous contentions regarding the severity of the his impairment. She contended that his social and industrial judgment was impaired; that he had memory loss, very poor personal hygiene, and needed regular aid and attendance; was moody and irritable; and was psychotic. At this time a copy of the Veteran's Social Security earnings statement was submitted it indicated no reported earnings from 1951 to the present with the exception of a single year earnings of $229 in 1953. 

In June 1995 a VA mental disorder examination of the Veteran was conducted. The examiner noted that he had examined the Veteran in January 1995, and had found no major psychiatric diagnosis, although there had been a history of one in the past. 
During the examination, the Veteran reported activities of daily living similar to those reported in the November 1994 private mental status evaluation conducted by Dr. R.T. In addition, he reported that a visitor would sometimes come by and help him with cutting rocks, and that he might talk to some people during the day. He reported having dreams but denied major nightmares. He reported last working 10 years prior as a janitor for two months but lost his job when the plant was closed down. He also reported that he had "been on no psychiatric medicines for about 15 or 20 years" This conflicts with the totality of the other evidence of record which indicates that the Veteran has never been treated for his service-connected schizophrenia since separation from service in 1943. He reported that he lived in the home his parents gave him and that he kept the place clean. He also reported helping with the yard work, including working in the garden. The wife also talked with the examiner and reported that he could not remember things, had poor personal hygiene, and that he needed to be prompted. She reported that he was moody and irritable but not violent.

Mental status examination revealed the Veteran was pleasant and cooperative. He did not appear to know the current date; he stated it was June 12 when in fact it was June 16. His affect was appropriate and not nervous. Insight was described as normal for a man of his age. Judgment was found to be intact and he was described as knowing right from wrong. The examiner noted diagnosis of schizophrenia made by Dr. R.T in the December 1994 private examination report but, the concluded that there was no evidence of schizophrenia on examination at this time. 

It was concluded that the Veteran had a history of psychotic episodes in the long past and that he had not had any medical treatment for a disorder of significance over the past 10 or 15 years. No major psychiatric symptomatology was found, but the Veteran was found to have some limitations of socialization skills. The examiner was unable to determine whether this limitation was due to his psychiatric condition or simply due to a lack of social skills.

Under "Axis V," the VA examiner found the Veteran to have some probable slight symptomatology of social problems as well as some possible concentration problems. He was found to be functioning at a level of "70" for his age group.

In August, September, and October 1995 the Veteran's wife submitted lengthy handwritten statements in which a variety of contentions were made. In pertinent part, she contended that the Veteran was unemployable and that his mental disability warranted a higher evaluation than what he was currently receiving. She indicated that the Veteran should be entitled to a total disability rating for compensation base on individual unemployability (TDIU) because he was entitled to benefits from the Social Security Administration (SSA). She also recounted what she perceived to be a variety of misdeeds performed by VA at the expense of the Veteran's well being. Similar statements were subsequently submitted by her on multiple occasions throughout the pendency of the appeal.

Essentially, the Veteran's wife contends that the Veteran's service-connected schizophrenia has been totally disabling resulting in his being unable to be employed throughout his entire adult life. She contends that he is so disabled that he is, and has been unable to support himself, or adequately function without the support of either his parents or her, his wife. The evidence contained in a VA Form 21-0538 reveals that the Veteran and his wife have been married since 1976 and that they were married in the Philippines. The wife acknowledges in prior statements that she was married to the Veteran since 1976 and that she was unaware that he had a psychiatric disability when she married him. So she asserts that the Veteran has been totally disabled from his schizophrenia his entire adult life; yet the evidence shows that he was functioning well enough that she was unaware of his mental disability upon marriage, and he was functioning adequately enough to travel from Montana to the Philippines for the wedding. 

Despite the wife's assertions of the Veteran's total impairment resulting from schizophrenia, there is no objective evidence showing any treatment for the disability since 1943. The Veteran's wife asserts he is totally disabled from schizophrenia and has limited occupational and social functioning. Yet, in the over three decades that they have been married she has never insisted that he even try treatment for the disability. 

In August 1997, a VA mental disorders examination was conducted. The Veteran initially indicated that he was in a difficult financial situation and noted that he had not been approved for SSA benefits because he had not worked long enough. The examiner reported trying to imply to the Veteran that he had social difficulties; however, the Veteran contended that he got along well with people. He did acknowledge that he tended to isolate himself.

On examination, the Veteran was noted as being dressed in a long-sleeved cowboy shirt and was wearing a red hat. On memory testing the Veteran was able to remember all three items told to him two and a half minutes later with prompting. On mathematical calculations, the examiner found that he appeared to be uncooperative and guessing. The examiner found that he could distinguish right from wrong, and was able to present himself well enough to be understood and cooperate in the examination with the possible exception of the mathematical calculations. His affect was depressed and he seemed to be somewhat resigned to the problems of growing older and dealing with financial problems, specifically indicating he wanted to get his compensation back.

It was concluded that the Veteran had a history of a psychotic episode in the past but that he had not had any major psychiatric treatment. No specific diagnosis was made. Under "Axis V," the examiner found the Veteran to have a limitation in social functioning as well as some memory problems. As with the prior examination the Veteran was found to be functioning in the "70 range" for his age group. In terms of employability, the examiner noted that the Veteran was 76 years old, and found that his motivation and social skills would prevent him from working a full-time job at this particular stage of his life.

In June 1998, the RO received the Veteran's formal application for TDIU. It was indicated that he had never been employed, and that he had last attempted to obtain employment in 1950. Submitted with this application was another copy of the Veteran's SSA earnings statement indicating he had earned no income from 1954 through 1995. It also advised the Veteran that he was old enough for retirement benefits, and that he therefore no longer qualified for disability benefits. As a result, the SSA declined to give a benefit estimate. It further noted that he did not have enough work credits to be eligible for retirement benefits.

In June 1999, the RO received additional lay statements which, in pertinent part, reasserted that the Veteran had been unable to work because of his mental condition.

In June 1999 a hearing before the Board that was conducted in conjunction with the prior appeal for an increased disability rating. The Veteran contended that his mental disability rendered him unemployable, and that he had not been employed since his discharge from service. Referring to the information provided by the Veteran during the August 1997 VA examination, the representative asked whether the Veteran would go down to the restaurant and sometimes have conversation, but a lot of times would not engage in conversation; he agreed. The Veteran reported watching the news, that he was able to hear and understand the news, and that he sometimes would have a conversation with his wife about the news a half-hour later. He further testified that he sometimes performed home maintenance and that he was able to do it by himself. However, he indicated that he was no longer able to perform repair work on a vehicle.

The Veteran testified the he sometimes talked to his neighbors if they were around, at a rate of about once a week. He also testified that he would sometimes discuss the day with his wife at dinner. He reported that he would go to a restaurant for coffee later in the evening for about an hour, and then return home after this and go to sleep. He reported that he was able to sleep fairly easily, but would have disturbing dreams once in awhile. He also indicated that during the night he would sometimes go outside when he heard a noise to check and make sure that there was no one "fooling around" on his property. The representative asked if he felt that people were out to bother him, and he responded that he did not have this feeling. 

The Veteran's wife next testified that her husband would sometimes get mad when talking about conversations he had at the restaurant, or even when watching the television. She reported that she more or less had to tell him what he should be doing. She also testified that the Veteran's conversations with his neighbors were minimal, and that actual conversations were rare. She reported that he had no other social involvement. She indicated that she had to supervise a lot of his activities around the house, including mowing the lawn. She further testified that the Veteran could be taken advantage of and that she did not trust him to perform business transactions as a result. She acknowledged that he still drove but that he would get lost and needed her to navigate. She stated that she had to remind him to maintain his personal hygiene. She opined that he was incapable of working. She also testified that the Veteran's condition had not changed and that it remained the same. 

In May 2000, a VA examination for housebound status or permanent need for regular aid and attendance was conducted. During this examination, the Veteran was described as well- nourished, healthy, and that he communicated well. It was noted that he had a schizophrenia-related mental status. The wife reported that he needed help with bathing and that he was unable to pay bills. It was concluded that the Veteran's main issue was psychiatric, and that he needed assistance with showering, paying bills, and meals, all of which were performed by his wife.

In May 2000, a VA psychiatric Compensation and Pension examination of the Veteran was also conducted. It was noted that the record indicated that the Veteran's psychiatric condition may have been in remission for many years. He continued to deny any treatment for his psychiatric disability, including denying taking any psychotropic medication. He indicated that he tried to maintain the house and yard, but the examiner noted that other records indicated that his spouse was taking care of such responsibilities. He Veteran reported going to different places to talk to people; however, the examiner also noted the spouse's report that he was somewhat reclusive and restricted in his interactions with others. When asked if he had an impairment of thought process or communication, the Veteran replied that he sometimes needed to think back on things and had difficulty communicating with others, maintaining conversations, as well as thinking along a specific joining of thoughts. The Veteran denied hallucinations or delusions and cited no inappropriate behavior. He denied being suicidal or homicidal. He indicated that he had no personal problems with maintaining his personal hygiene or other basic activities of daily living. However, the wife indicated that he did have trouble with doing household chores and following through with instructions, and that she had to continually supervise his efforts in the home.

The Veteran was noted as having some orientation problems with place, and that he indicated that he would get confused at times and had problems with short-term memory loss. He denied long-term memory problems. He cited no obsessive or ritualistic behaviors. He indicated no particular panic attacks or generalized anxiety, and he denied depressive symptoms. He denied having any problems with sleeping. The primary problems reported were physical in nature. In terms of competency, the Veteran reported that his wife took care of the finances and indicated that he could not do this very well. The Veteran displayed no problem with rate and flow of speech during the examination. There appeared to be no impairment in impulse control. Testing revealed considerable difficulty in basic information and vocabulary. He was thought to be of below-average intelligence. It was concluded that the Veteran had some severe difficulties and functioning that were probably related to his below-average intelligence. The examiner further found that that he appeared to be at least mildly mentally impaired in his cognitive ability, which would "probably impair his ability to function and to make decisions."

The Axis I diagnosis was schizophrenia, paranoid-type, "in remission . . . however, having some difficulties related to this that are within the occupational arena as well as relationships and having some unusual ideation with regard to his own physical health and ability to function." It was further found under Axis II that at least mild mental retardation was indicated by pertinent testing. Finally, it was concluded in Axis IV that the Veteran had moderate to severe psychosocial symptoms in terms of interacting, maintaining finances, and maintaining basic activities of living and functioning within the household.

During an October 2001 hearing before the Board regarding the increased rating issue then under appeal, the Veteran testified that he had not worked recently and did not have enough "points" to receive SSA benefits. He indicated that he was last seen for his psychiatric disorder in 1990 by Dr. R.T. The wife testified that he saw Dr. R.T. in 1995. They appear to be referring to the November 1994 private mental health evaluation as no treatment is indicated by the record. 

As noted above, a March 2002 Board decision on March 11, 2002, confirmed the denial of the assignment of a disability evaluation in excess of 50 percent for schizophrenia, paranoid type. The appellant appealed that determination to the Court, which remanded the case to the Board, which in turn remanded it to the RO in December 2004 for additional development.

On March 14, 2005, the Veteran underwent a private initial clinical assessment at the Western Montana Mental Health Center. The assessment was conducted by a social worker. The examiner noted that the Veteran had no mental health treatment since 1943. The diagnoses were schizophrenia undifferentiated (by history), and rule-out dementia. The symptoms reported were memory problems, problems with activities of daily living, occasional auditory and visual hallucinations, problems concentrating, and some anxiety. A Global Assessment of Functioning (GAF) Scale score of 46 was assigned. A GAF rating is a scale reflecting the psychological, social, and occupational functioning on a hypothetical continuum of mental-health illness. It represents overall functioning accounting for all mental impairments present. Richard v. Brown, 9 Vet. App. 266, 267 (1996), citing Diagnostic and Statistical Manual of Mental Disorders (4th ed.1994). GAF scores of 41 to 50 reflect serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifter) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). See QUICK REFERENCE TO THE DIAGNOSTIC CRITERIA FROM DSM-IV, 46-7 (1994).

In April 2005, a private psychological evaluation of the Veteran was conducted by a Clinical Psychologist, S.L.M., Ph.D. In the report of that evaluation, it was noted that the sources of information included a clinical interview, psychological testing, the clinical assessments of Western Montana Mental Health Center, and the medical records dated from November 1942 to December 1947, and from May 1995 to May 2000 as provided by the Veteran's attorney. The diagnoses listed were schizophrenia, residual type, on Axis I, and mild retardation on Axis II.

In terms of a summary of findings, Dr. S.L.M. noted that the Veteran had been discharged from the military in 1942 following a first psychotic break episode, in which "schizophrenia of the paranoid type (then called dementia praecox)," was diagnosed. The examiner noted that although he received no psychiatric treatment since leaving the military hospital in the 1940's, the Veteran's psychotic symptoms were under relatively good control. She noted further that the Veteran was unable to support himself and had almost no work history, living with his parents until his marriage in 1976, and being supported by his spouse since that time. In terms of a current evaluation, there was evidence of an ongoing thought disorder with paranoia, eccentric behavior, flat affect, mildly disorganized speech, occasional hallucinations, and odd beliefs. It was also reported that the Veteran has had probable mental retardation since early childhood as he was passed along in school and did graduate, but was clearly not capable of learning like his peers. Dementia was ruled out as the Veteran appeared to Dr. S.L.M. to have had cognitive impairment his entire life and had been unable to support himself. The examiner also noted that the Veteran, due to his age, may have an additional dementia process on top of his mental retardation and schizophrenia. Dr. S.L.M. reported that the combination of significant cognitive deficiencies plus psychotic thinking and virtually no work history or history of supporting himself at all, makes the Veteran, at the age of 84, quite unsuitable for employment. It was further concluded that he was not capable of managing his own funds. A GAF assigned was 35.

A GAF of 31 to 40 is assigned where there is some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). See QUICK REFERENCE TO THE DIAGNOSTIC CRITERIA FROM DSM-IV, 46-7 (1994).

In November 2005, a VA psychiatric examination of the Veteran was conducted by VA psychologist, R.J.B., Ph.D. In the report of the examination, the Veteran was noted to be friendly and cooperative but had difficulty with memory and cognitive functioning which impacted his ability to provide reliable information. The wife indicated that the Veteran has not worked, and that she managed all the money and household chores. The Veteran appeared to the examiner to be experiencing significant confusion during the interview. He was not oriented, and described what the examiner thought may have been hallucinations. He also demonstrated some delusional thinking in that he felt that people were stealing from him. Both the Veteran and his wife described some mild auditory hallucinations as well as paranoid thinking. The Veteran's thinking was also characterized by tangentiality as he would often ramble and his speech was difficult to understand. Concentration appeared to be significantly reduced. He had difficulty tracking the conversation. It was the examiner's opinion that a diagnosis of paranoid schizophrenia continued to be warranted. The examiner also noted that the Veteran had previously been diagnosed with mild mental retardation but it was unclear if this diagnosis was accurate, or whether it related to dementing condition. An overall GAF of 35 was assigned. The examiner also noted that the Veteran did not appear to be capable of living independently or taking care of his own needs. He also reported that it was likely that the Veteran's paranoid schizophrenia was of such severity as to markedly impact his ability to relate to others in the work setting. The Veteran also did not appear to be capable of managing funds in his own best interest.

The VA examiner expressly agreed with the April 2005 diagnosis of schizophrenia by private psychologist Dr. S.L.M., along with the assignment of the GAF score of 35. The examiner also specifically indicated the Veteran's "psychosis is a condition of long standing dating back to 1942." The evidence is clear that the Veteran had a psychotic episode in service and that, despite variation in psychiatric terms from 1943 to the present, he has a diagnosis of schizophrenia which dates from 1943 to the present. That the Veteran's schizophrenia is longstanding and dates back to service is not in question; what is in question is the severity of the disability. 

The assigned GAF score of 35 in the above examination reports is rather low. However, it is a "Global Assessment of Functioning" which accounts for all the Veteran's mental impairment. Besides the service-connected schizophrenia, whose disability rating and effective date are at issue, there is also evidence of nonservice-connected cognitive impairment. The April 2005 private examination report indicated probable mental retardation since early childhood along with possible dementia as the Veteran is now of advanced age. That the Veteran suffers from mental retardation or exceptionally low level of intelligence is supported by other evidence of record including the VA field examination reports from the 1940s. The November 2005 VA examination report acknowledged that the Veteran "displayed a number of characteristics of significantly below average intellectual abilities," but the examiner was unclear if they were the longstanding (mental retardation from childhood) or more recent (dementia due to advanced age). 

In December 2005, the RO issued a rating decision that increased the disability evaluation for schizophrenia, paranoid type, from 50 percent to 100 percent, effective from March 14, 2005. As noted, the Veteran subsequently perfected an appeal as to the effective date assigned.

At the request of the RO rating board, Dr. R.J.B., the VA psychologist who had conducted the November 2005 VA examination, issued an addendum opinion in July 2006. This explanation of the findings of his earlier November 2005 VA examination. The addendum indicated that the Veteran's records had been thoroughly reviewed. It set out a detailed narrative of the Veteran's psychiatric history from his period of service through the November 2005 VA examination. Dr. R.J.B. wrote in summation that it was evident from the review of the records that the Veteran exhibited a psychotic break that lead to his discharge from the Navy; that the Veteran did not undergo any significant mental health intervention over the years; that he did not exhibit any cognitive deficits upon examination in 1991, but from 1994 through the examination in November 2005, the Veteran's cognitive deficits worsened from mild to severe. Dr. R.J.B. opined that this course would suggest that the Veteran's severe cognitive deficits are related to a dementing condition, and not a condition of long-standing. In reference to the Veteran's service-connected schizophrenia, Dr. R.J.B stated that it appeared to be in long-term remission as reflected by the fact that the Veteran did not seek mental health intervention, and that the reports between 1945 and July 2000 all described either no psychiatric symptoms or schizophrenia in remission. Dr. R.J.B. noted that when he saw the Veteran [in November 2005], he had mild psychotic symptoms, explaining that it is not uncommon for these symptoms to be present in individuals experiencing dementia. Dr. R.J.B. concluded by stating that based solely on the diagnosis of service-connected schizophrenia, it was felt that a GAF of 65 would be most descriptive, and that the symptoms were relatively mild. The Veteran's primary limitations were said to be related to his severe cognitive deficits.

In November 2006, Dr. R.J.B. issued a second addendum in an expressed effort to explain any perceived discrepancies between his November 2005 examination report and the July 2006 addendum to that report. In this addendum, Dr. R.J.B. reemphasized that based upon his review of the records dating back to May 1945, the Veteran had a history of schizophrenia that was generally described by others over the years as being in remission; that the Veteran was of average intelligence until recently; that the description of the Veteran as mildly retarded was inaccurate in that his cognitive deficits could best be described as dementia; and that the records do not confirm that the Veteran currently has a psychotic disorder. Dr. R.J.B. went on to explain that the Veteran's preexisting psychiatric problems would be best described as mild in that past records indicated that the Veteran would have been able to use judgment, show insight, think abstractly, and could adapt to change or stress, prior to the onset of his dementing condition. It was further noted that prior to the Veteran's dementia, concentration was not reduced and he was able to establish effective relationships with others as reflected by his past marital and work history. Dr. R.J.B. concluded by stating that the opinion offered in the July 2006 addendum more accurately reflected the Veteran's history as documented by the records than did the initial report of the November 2005 examination.

The Court has expressed concern with the July and November 2006 medical addenda provided by Dr. R.J.B., the VA examiner who conducted the November 2005 VA Compensation and Pension examination. First the Court instructed the Board to "take pains to explain why after it received . . . [the] November 2005 examination report, which was favorable to [the Veteran's] claim, two additional addenda were sought." The Court indicated that VA was impermissibly conducting additional development to obtain evidence against the Veteran's claim. 

The Court noted that the instructions to the examiner when the addenda were requested are not of record. The Board did not order the addenda, rather it appears that the RO rating board requested the addenda in an attempt to ascertain the degree of disability resulting from the Veteran's service-connected schizophrenia without consideration to any nonservice connected mental deficiency. 

"Congenital and developmental defects, refractive error of the eye, personality disorders and mental deficiency as such are not diseases or injuries within the meaning of applicable legislation" for service connection purposes. 38 C.F.R. § 3.303(c) (emphasis added). Mental retardation may not be service-connected, but a mental disorder superimposed upon mental retardation may be service-connected. 38 C.F.R. § 4.127. 

There is significant evidence of record including the VA field examination reports from the 1940s and the April 2005 private psychological evaluation, which the Court finds so compelling, which establish that the Veteran has a mental deficiency, including the strong possibility of mental retardation since childhood. The November 2005 examination report also acknowledged the presence of a mental deficiency, but was unclear as to whether it mental retardation dating to childhood, or more recent onset dementia due to advancing age. Accordingly, the two addenda sought do not appear to be some sinister attempt to develop negative evidence, but rather an attempt to have the medical professional differentiate what portion of the Veteran's overall GAF was the result of his service-connected schizophrenia and what portion was the result of the nonservice connected mental deficiency, variously diagnosed as mental retardation and dementia.

The Court's second concern with the Board's prior reliance on the July and November 2006 medical addenda provided by Dr. R.J.B. was with respect to the credibility and probative value assigned. The Court viewed the opinions expressed in the July and November 2006 addenda to be an "abrupt change" from those expressed by Dr. R.J.B. in the November 2005 VA examination report. Specifically the "Court wonders how such an abrupt change in opinion by [Dr. R.J.B.] in less than an year could fail to raise the question of his credibility or the proper probative weight to place on his opinions." 

Review of the November 2005 VA examination report and the July and November 2006 medical addenda do not appear to indicate an "abrupt change in opinion." The November 2005 examination report, in fact, generally agreed with the findings of the April 2005 private examination report which the Court finds compellingly persuasive. Both concurred in the diagnosis of schizophrenia that was longstanding, dating back to service in 1942. Both reports concurred in the assignment of a GAF of 35. Both reports indicated the presence of a nonservice-connected mental deficiency which was accounted for in the assignment of the GAF of 35. 

The July and November 2006 medical addenda by Dr. R.J.B. do reveal that the examiner revised the assigned GAF from a very poor 35 to a much better functioning 65 in less than a year. However, the revised GAF of 65 was an estimate by the examiner of the impact of the service-connected schizophrenia alone on the Veteran's mental function without accounting for the impact of the nonservice-connected mental deficiency. To the extent that the July 2006 addendum indicated that the Veteran's schizophrenia was in remission, it referenced the complete lack of mental health treatment or intervention for the almost half century of time from the Veteran's separation from service until 2000. This history of a lack of treatment was noted on the 2005 examination. The November 2006 addendum notes that the Veteran's prior history of schizophrenia was described as being in remission on multiple prior examination reports. The two addenda appear to be the examiner's attempt to differentiate the level of disability resulting from the Veteran's service-connected schizophrenia, which has been longstanding, existing from service, albeit generally in remission with little evidence of treatment or documented psychotic symptoms for a period of almost half a century, from the level of disability resulting from the Veteran's nonservice-connected mental deficiency, which the record indicates is both mental retardation and dementia. 

In December 2006, the private Clinical Psychologist who had previously examined the Veteran in April 2005, Dr. S.L.M., offered a report of Psychological Evaluation that was in response to a request from the Veteran's attorney to state "explicitly when [the Veteran] started displaying the symptoms that warrant a 100 percent rating." In this report, Dr. S.L.M. indicated that her sources of information were the clinical interview of the Veteran and his spouse, psychological testing, letters from the Veteran's attorney, the December 2005 rating decision, and all information gathered for the April 2005 psychological evaluation. Following a mental status examination and psychological testing, the diagnostic impression on Axis I was schizophrenia, residual type (paranoid), and rule-out dementia. The impression on Axis II was mild mental retardation. The GAF assigned was 35. In summation of her findings, Dr. S.L.M. first discussed the criteria for a 100 percent disability evaluation under the VA rating schedule. She then indicated that she was not surprised that the current evaluation showed no change in the Veteran's cognitive and emotional functioning since April 2005, given the chronic nature of his symptoms. She noted that as described in the April 2005 evaluation, the Veteran was incapable of working due to his psychological status since at least the early 1950's, having been supported initially by his parents and then by his wife since their marriage in 1976. Dr. S.L.M. noted that the Veteran's wife described moderate to severe impairment from at least the 1970's and that the Veteran was declared partially disabled by VA in the 1990's. She then noted that an evaluation performed by Dr. R.T. in 1994 showed a prominent thought disorder, significant distractibility, and impaired recent and remote memory, findings that Dr. S.L.M. stated had been replicated each time that the Veteran had been evaluated since. Dr. S.L.M. concluded that it was her belief, based upon all available reports and knowledge regarding the chronic nature of both schizophrenia and mental retardation, that the Veteran began displaying the symptoms to warrant a 100 percent disability rating at least as early as 1994.



III. Applicable Law and Regulations

Unless otherwise provided, the effective date of an award of increased evaluation shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of the application therefor. 38 U.S.C.A. § 5110(a); 38 C.F.R. § 3.400(o)(1). The effective date of an award of increased compensation may, however, be established at the earliest date as of which it is factually ascertainable that an increase in disability had occurred, if the application for an increased evaluation is received within one year from that date. 38 U.S.C.A. § 5110(b)(2); 38 C.F.R. § 3.400(o)(2). Accordingly, the relevant temporal focus for adjudicating an increased-rating claim is on the evidence concerning the state of the disability from the time period one year before the claim was filed until VA makes a final decision on the claim. See, Moore v. Nicholson, 21 Vet. App. 211, 216-17 (2007)

In addition, the Court has indicated that it is axiomatic that the fact that must be found in order for entitlement to an increase in disability compensation to arise, in other words, that the service-connected disability must have increased in severity to a degree warranting an increase in compensation. See Hazan v. Gober, 10 Vet. App. 511, 519 (1992) (noting that, under § 5110(b)(2) which provides that the effective date of an award of increased compensation shall be the earliest date of which it is ascertainable that an increase in disability had occurred, "the only cognizable 'increase' for this purpose is one to the next disability level" provided by law for the particular disability).

The key to this appeal is to ascertain the earliest date as of which it is factually ascertainable that an increase in the Veteran's service-connected schizophrenia disability had occurred. To determine whether an increase in severity had occurred VA must apply the rating criteria set forth in the applicable regulations. 

Service-connected disabilities are rated in accordance with a schedule of ratings which are based on average impairment of earning capacity. Separate diagnostic codes identify the various disabilities. 38 U.S.C.A. § 1155; 38 C.F.R. § 3.321, and Part 4 (2002). 

The disability ratings evaluate the ability of the body as a whole, or the psyche, to function under the ordinary conditions of daily life including employment. Evaluations are based on the amount of functional impairment; that is, the lack of usefulness of the rated part, system, or the psyche in the present case, in the self support of the individual. 38 C.F.R. § 4.10.

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for the higher rating. 38 C.F.R. § 4.7.

In considering the severity of a disability it is essential to trace the medical history of the Veteran. 38 C.F.R. §§ 4.1, 4.2. Consideration of the whole recorded history is necessary so that a rating may accurately reflect the elements of disability present. 38 C.F.R. § 4.2; Peyton v. Derwinski, 1 Vet. App. 282 (1991).

In the August 2010 remand, the Court specifically instructed the Board to consider staged ratings in the present case. Separate disability ratings can be assigned for separate periods of time based on the facts found; this is a practice known as "staged" ratings. See Hart v. Mansfield, 21 Vet. App. 505 (2007). Based on those instructions, the appeal before the Board appears to have been changed from one merely involving whether an earlier effective date for the assignment of a 100 percent disability rating for the Veteran's service-connected schizophrenia, to completely re-litigating the issue of entitlement to a increased disability rating for the Veteran's service-connected schizophrenia. 

The Veteran's service-connected paranoid schizophrenia is rated under Diagnostic Code 9203. The regulations for rating mental disorders were revised during the pendency of this appeal. Effective November 7, 1996, the VA Schedule, 38 C.F.R. Part 4, was amended with regard to rating mental disorders, including paranoid schizophrenia. See 61 Fed. Reg. 52695 (Oct. 8, 1996) (codified at 38 C.F.R. § 4.130).

Where the law or regulations governing a claim are changed while the claim is pending, the version most favorable to the claimant applies from the effective date of the change, while the previous version of the regulation applies prior to the date of change. Karnas v. Derwinski, 1 Vet. App. 308 (1991); Kuzma v. Principi, 341 F.3d 1327 (Fed. Cir. 2003); VAOPGCPREC 7-2003 (Nov. 19, 2003), 69 Fed. Reg. 25179 (2004). The amended rating criteria can be applied only for periods from and after the effective date of the regulatory change. The Board can apply the prior regulation to rate the Veteran's disability throughout the appeal period under certain conditions. VAOPGCPREC 3-00 (Apr. 10, 2000), 65 Fed. Reg. 33422 (2000).

The applicable criteria to rate paranoid schizophrenia in effect prior to November 7, 1996, provided for the assignment of disability ratings ranging from noncompensable to 100 percent. Active psychotic manifestations of such extent, severity, depth, persistence or bizarreness as to produce total social and industrial inadaptability warranted a 100 percent ratings. A 70 percent rating was warranted for lesser symptomatology such as to produce severe impairment of social and industrial adaptability. A 50 percent rating contemplated considerable impairment of social and industrial adaptability. A 30 percent rating contemplated definite impairment of social and industrial adaptability. Mild impairment of social and industrial adaptability warranted the assignment of a 10 percent disability rating. Finally, psychosis in full remission was to be rated at a noncompensable (0%) disability rating. 38 C.F.R. § 4.132, General Rating Formula for Psychotic Disorders, Diagnostic Code 9203 (1996).

In Hood v. Brown, 4 Vet. App. 301 (1993), the Court stated that the term "definite" in 38 C.F.R. § 4.132 was "qualitative" in character, whereas the other terms were "quantitative" in character, and invited the Board to "construe" the term "definite" in a manner that would quantify the degree of impairment for purposes of meeting the statutory requirement that the Board articulate "reasons or bases" for its decision. 38 U.S.C.A. § 7104(d)(1) (West 2002).

In a precedent opinion, dated November 9, 1993, the General Counsel for VA concluded that "definite" is to be construed as "distinct, unambiguous, and moderately large in degree." It represents a degree of social and industrial inadaptability that is "more than moderate but less than rather large." VA O.G.C. Prec. Op. No. 9-93, 59 Fed. Reg. 4753 (1994). In that opinion, the term "considerable," as used in 38 C.F.R. § 4.132 to describe the criterion for a 50 percent evaluation, was defined to describe a "rather large," degree of strength or intensity. Id., at 5. VA, including the Board, is bound by this interpretation of the term. 38 U.S.C.A. § 7104(c) (West 2002).

Effective November 7, 1996, the evaluation of a mental disorder requires consideration of the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the Veteran's capacity for adjustment during periods of remission. Evaluations will be assigned based on all evidence of record that bears on occupational and social impairment, rather than solely on an examiner's assessment of the level of disability at the moment of the examination. The extent of social impairment shall also be considered, but an evaluation may not be assigned based solely on the basis of social impairment. 38 C.F.R. § 4.126. Under 38 C.F.R. § 4.130, all service-connected mental health disabilities are rated pursuant to the General Rating Formula for Mental Disorders.

Under the current schedular criteria, a noncompensable (0%) disability rating is warranted for a mental condition that has been formally diagnosed, but symptoms are not severe enough to interfere with occupational and social functioning or to require continuous medication. 

A 10 percent rating is assigned where there is occupational and social impairment due to mild and transient symptoms that decrease work efficiency and ability to perform occupational tasks only during significant stress or with symptoms controlled by continuous medication. 38 C.F.R. § 4.130, General Rating Formula for Mental Disorders, Diagnostic Code 9203 (2010).

A 30 percent evaluation is assignable for occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, and mild memory loss (such as forgetting names, directions, recent events). Id.

A 50 percent rating is assigned for paranoid schizophrenia productive of occupational and social impairment with reduced reliability and productivity due to such symptoms as flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. Id.

A 70 percent rating is assigned for paranoid schizophrenia productive of occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); and inability to establish and maintain effective relationships. Id.

A 100 percent rating is assigned for paranoid schizophrenia productive of total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; and memory loss for names of close relatives, own occupation, or own name. Id.






IV. Analysis

As noted above, in May 1944, the RO reduced the disability rating for the Veteran's psychiatric disability, therein characterized as dementia praecox, to 30 percent. It was further reduced to a noncompensable in November 1948, as a contemporaneous examination had found the disorder to be in remission. The Veteran did not file a notice of disagreement within one year of having been provided notice of that decision.

In a May 1991 rating decision, the RO continued the noncompensable disability rating for the Veteran's psychiatric disorder, therein characterized as schizophrenia, paranoid type. The Veteran did not file a notice of disagreement within one year of having been provided notice of that decision.

The appellant did not file another claim of entitlement to an increased disability evaluation for his service-connected psychiatric disorder until an informal claim for entitlement to an increased evaluation was received on September 30, 1994. This is the date of claim for consideration with respect to the effective date issue presently on appeal. 

In December 2005, the RO granted an increased evaluation from 50 percent to 100 percent for the Veteran's service-connected paranoid schizophrenia, effective from March 14, 2005. This is the date the Veteran underwent a private initial clinical assessment at the Western Montana Mental Health Center, which was conducted by a social worker. The evidence indicated a diagnoses of were schizophrenia undifferentiated (by history), and rule-out dementia. The symptoms reported were memory problems, problems with activities of daily living, occasional auditory and visual hallucinations, problems concentrating, and some anxiety. A GAF of 46 was assigned, reflecting serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifter) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). See QUICK REFERENCE TO THE DIAGNOSTIC CRITERIA FROM DSM-IV, 46-7 (1994).

The Veteran's claim for an earlier effective date for the turns upon the following question: What is the earliest date between September 30, 1993 (one year prior to date of claim) and March 14, 2005 (the currently assigned effective date) that it was factually ascertainable that the Veteran's service-connected paranoid schizophrenia manifested the requisite pathology to meet the rating criteria for a 100 percent disability rating?

The Board finds, after consideration of all of the available evidence in the claims file, that the preponderance of the evidence is against the assignment of an effective date earlier than March 14, 2005, for the grant of a 100 percent disability evaluation for service-connected paranoid schizophrenia under both the previous and amended rating criteria for this disorder. 38 C.F.R. §§ 3.102, 4.3, 4.132, Diagnostic Code 9203 (1996) (effective prior to November 7, 1996); 38 C.F.R. §§ 3.102, 3.400(q)(ii), 4.3, 4.130, Diagnostic Code 9203(2010) (effective November 7, 1996). 

As ordered by the Court, the Board has specifically considered the evidence and opinions offered by lay persons which are of record. A layperson is competent to report on the onset and continuity of his current symptomatology. See Layno v. Brown, 6 Vet. App. 465, 470 (1994) (an individual is competent to report on that which he or she has personal knowledge). Lay evidence can also be competent and sufficient evidence of a diagnosis or to establish etiology if (1) the layperson is competent to identify the medical condition, (2) the layperson is reporting a contemporaneous medical diagnosis, or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional. Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed.Cir.2009); Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007).

The Board also has a duty to assess the credibility and weight of the evidence. See Wood v. Derwinski, 1 Vet. App. 190, 193 (1991). In weighing credibility, VA may consider interest, bias, inconsistent statements, bad character, internal inconsistency, facial plausibility, self interest, consistency with other evidence of record, malingering, desire for monetary gain, and demeanor of the witness. Caluza v. Brown, 7 Vet. App. 498, 511 (1995)

The evidence of record provided by the Veteran is primarily in the form of his responses contained in the examination reports of record and hearing transcripts. There are a large volume of documents of record, primarily letters and written statements containing evidence from other lay persons which include: the Veteran's wife; other family members such as cousins; and, friends and acquaintances. The statements from persons other than the wife all essentially indicate the same information: that the Veteran has never worked in his entire adult life; that he has been supported by his parents and/or his wife. The Board accepts these statements as true; they are confirmed by SSA records showing essentially no income earnings for the Veteran's entire adult life. However, most of these statements do not report any potential symptoms of a mental disorder, only that the Veteran was never employed. A November 1999 statement from the Veteran's son does indicate that the Veteran was never employed, often told strange stories and exhibited some symptoms of paranoia by jumping to conclusions and checking the windows at night. A December 1999 statement from a friend noted the Veteran's unemployment and related it to a "mental problem." The statement further indicated that the Veteran had difficulty handling money, was taken advantage of by people and laughed at. Again this statement generally refers to a mental disorder. It does not specifically report psychotic behavior; it does not differentiate between the Veteran's service-connected schizophrenia and the mental deficiency which medical evidence indicates is present. The author is apparently a restaurant worker and does not appear to have the requisite psychiatric training to ascribe the Veteran's symptoms of unemployment and difficulty handling money to his service-connected schizophrenia as opposed to any nonservice-connected mental deficiency.

The Veteran's wife has, by far, submitted the most lay statements of record. Her letters, and the attached duplicate copies of records easily account for several volumes of the record on their own. When all of the wife's statements are considered they essentially contend that the Veteran's service-connected schizophrenia has been totally socially and occupationally disabling and that this is evidenced by he being unable to be employed throughout his entire adult life. She contends that he is so disabled that he is, and has been, unable to support himself, or adequately function, without the support of either his parents or her, his wife. Again, the evidence of record establishes that the Veteran and his wife have been married since 1976 and that they were married in the Philippines. The wife acknowledges in some statements that she was married to the Veteran since 1976 and that she was unaware that he had a mental disorder when she married him. While she asserts that the Veteran has been totally disabled from his schizophrenia his entire adult life, the evidence shows that he was functioning well enough that she was unaware of his mental disability upon marriage, and he was functioning adequately enough to travel from Montana to the Philippines for the wedding. 

Despite the wife's assertions of the Veteran's total impairment resulting from schizophrenia, there is no objective evidence showing any treatment for the disability since 1943. She alleges that his psychotic behavior is the cause of the Veteran's unemployment since their marriage in 1976; yet, in the over three decades that they have been married she has never attempted to have the Veteran treated for psychotic symptoms which she alleges were so severe as to result in total social and occupational impairment. By her own admission the wife is an elementary school teacher and not a trained mental health professional able to differentiate between symptoms of schizophrenia and mental deficiency which may have been the cause of the Veteran's inability to work. Because of the above noted inconsistencies, the Board finds the wife's lay statements and opinions linking the Veteran's life-long unemployment to his service-connected schizophrenia to be not credible and of no probative value. 

The Veteran has had no treatment for his service-connected schizophrenia since 1943. To restate: from 1943 to the present, a period of time of over half a century, the Veteran has not ever been treated for his service-connected schizophrenia. Even at present the Veteran is not being treated for his schizophrenia, despite the fact that he is in receipt of a 100 percent schedular disability rating for paranoid schizophrenia, a psychosis resulting in total occupational and social impairment. See, 38 C.F.R. § 4.130, Diagnostic Code 9203. All of the above lay statements assert that the Veteran's service-connected schizophrenia is so totally disabling that it resulted in life-long unemployment. These statements are from associates, friends, and close family including his wife and son. However, none of the statements indicates that the Veteran has ever had treatment or that any of these close family and friends ever sought to have the Veteran receive treatment for his schizophrenia. The Veteran's wife has indicated she did not want him to get treatment because she did not believe in "medications." She does however, apparently believe in collecting disability benefits on a psychosis which she is willing to leave untreated. The Board acknowledges that it can be difficult to have people suffering from mental disorders agree to treatment. However, evidence submitted by the wife indicates that she manages much of the Veteran's daily activities by telling him what to do and he generally complies with the activities and chores that she sets out for him. The above seriously calls into question the credibility of all lay statements of record asserting that the Veteran's service-connected schizophrenia is the primary cause of his unemployment. 

September 30, 1994 is the date of claim for an increased rating. There is no treatment shown for the Veteran's service-connected schizophrenia. Looking back to September 30, 1993, one year prior to the date of claim, reveals no medical, or other evidence related to the severity of the Veteran's service-connected schizophrenia. The most recent prior evidence of record is the May 1991 VA examination report which revealed "no evidence of psychosis at present. 

The next evidence of record is the December 1994, private mental status evaluation report from Dr. R.T. Some problems with memory, concentration, physical hygiene, and temper were indicated. The Veteran spoke with a flat tone of voice in response to questions, showing no enthusiasm, but he was deemed to be of average intelligence. While oriented in all spheres, it was noted that he seemed to lack concentration as the conversation continued. Remote and recent memory seemed to be impaired, and speech revealed some suspiciousness. It was thought that he seemed to exhibit a slight to moderate thought disorder. Concentration skills seemed "extremely poor." The examiner found that the Veteran's physical hygiene had deteriorated significantly over the past few years "according to him and his wife." It was thought that the symptoms had increased drastically during the last year or two, and his ability to drive seemed impaired, although it was acknowledged that he continued to drive. It was noted that the nature of the Veteran's mental psychiatric disorder was never fully explored in the past because he was basically untreated throughout his lifetime. Dr. R.T. concluded that the Veteran could benefit from medication for his "schizophrenic like condition." The diagnosis was undifferentiated schizophrenia.

This evidence showed that the Veteran's symptoms had increased drastically during the prior year or two. Based upon this evidence the Veteran's disability rating was ultimately increased from noncompensable (0%) to 50 percent. The Veteran's drastic increase in symptoms was thus appropriately rated because of the resulting considerable impairment of social and industrial adaptability. 38 C.F.R. § 4.132, General Rating Formula for Psychotic Disorders, Diagnostic Code 9203 (1996); Hood v. Brown, 4 Vet. App. 301 (1993); VA O.G.C. Prec. Op. No. 9-93, 59 Fed. Reg. 4753 (1994). 

The next medical evidence of record is the June 1995 VA mental disorder examination which found no major psychiatric diagnosis, although there had been a history of one in the past. Mental status examination, revealed the Veteran was pleasant and cooperative. He did not know the current date, but his affect was appropriate and not nervous. Insight was normal for a man of his age, and judgment was found to be intact. The examiner noted December 1994 diagnosis of schizophrenia but, the concluded that there was no evidence of schizophrenia on examination at this time. No major psychiatric symptomatology was found, but the Veteran was found to have some limitations of socialization skills. The examiner was unable to determine whether this limitation was due to his psychiatric condition or simply due to a lack of social skills.

In August 1997, another VA mental disorders examination was conducted. It was concluded that the Veteran had a history of a psychotic episode in the past but that he had not had any major psychiatric treatment. No specific diagnosis was made. In terms of employability, the examiner noted that the Veteran was 76 years old, and found that his motivation and social skills would prevent him from working a full-time job at this particular stage of his life.

In May 2000, a VA aid and attendance examination found the communicated well although his history of schizophrenia was noted. 

The May 2000, a VA psychiatric Compensation and Pension examination indicated a diagnosis of schizophrenia, paranoid-type, "in remission . . . however, having some difficulties related to this that are within the occupational arena as well as relationships and having some unusual ideation with regard to his own physical health and ability to function." An Axis II diagnosis of at least mild mental retardation was indicated by pertinent testing. Axis IV noted moderate to severe psychosocial symptoms in terms of interacting, maintaining finances, and maintaining basic activities of living and functioning within the household. Again the above evidence supports the assignment of a 50 percent disability rating, but not a rating in excess thereof. See 38 C.F.R. § 4.130, Diagnostic Code 9203 (2010). 

In the category of medical authority from those who do have the requisite medical background, the Board has determined that the medical history of the pathology associated with the Veteran's service-connected paranoid schizophrenia between 1991 and 2005 provided by Dr. R.J.B. in the two addenda to his November 2005 VA examination report most accurately reflects the contemporaneous medical records for that time period. The Board bases this determination not only upon an explicit comparison of the texts of those medical records, but also because Dr. R.J.B. provided sound reasons and bases with reference to specific medical findings in the record and pertinent medical principals that supported those findings.

Dr. R.J.B. wrote that the Veteran's psychotic break in service resolved relatively soon thereafter, and that service-connected schizophrenia appeared to be in long-term remission as reflected by the fact that the Veteran did not seek mental health intervention. He further noted that the reports between 1945 and July 2000 all described either no psychiatric symptoms or schizophrenia in remission. Although lay statements in the record appear to suggest otherwise, the contemporaneous medical records explicitly support that conclusion. Finding that the Veteran's most disabling condition was cognitive deficits related to a worsening dementia, Dr. R.J.B. noted that the Veteran did not exhibit any cognitive deficits upon examination in 1991, but that from 1994 through the examination in November 2005, the Veteran's cognitive deficits worsened from mild to severe. In the face of this precipitous decline in the Veteran's overall mental capabilities, the service-connected schizophrenia demonstrated only mild psychotic symptoms as recently as the November 2005 VA examination. Significantly, Dr. R.J.B. was able to effectively distinguish the disability picture associated with the Veteran's service-connected paranoid schizophrenia from his nonservice-connected mental deficiency / cognitive disorders (diagnosed as mental retardation, by Dr. S.L.M. in the April 2005 private evaluation and as Dementia by Dr. R.J.B.). He was able to do so without resort to speculation and unequivocally assigned a GAF of 65 to the diagnosis of service-connected schizophrenia based upon the examination, noting again that the symptoms were relatively mild, and that the Veteran's primary limitations were said to be related to his severe cognitive deficits resulting from his nonservice-connected dementia.

Based upon the opinions of Dr. R.J.B. and the contemporaneous record it is clear that the preponderance of the medical evidence demonstrated that the disability at issue, paranoid schizophrenia, was either in remission or presented with mild symptomatology, and that the assignment of the 50 percent rating for that time period represented the recognition of significant disability. 

As noted in the evidence section above, the November 2005 VA examination report by Dr. R.J.B. generally agreed with findings of the April 2005 private examination report which the Court finds compellingly persuasive. Both concurred in the diagnosis of schizophrenia that was longstanding, dating back to service in 1942. Both reports concurred in the assignment of a GAF of 35. Both reports indicated the presence of a nonservice-connected mental deficiency/ cognitive disorder which was accounted for in the assignment of the GAF of 35. Dr. R.J.B.'s subsequent addenda managed to essentially parse out the level of disability resulting from the service-connected and nonservice-connected mental disorders. 

What was clearly not shown during that time frame from 1994 to 2005, was the requisite symptomatology for the 100 percent disability rating for paranoid schizophrenia. Specifically, what was not shown by credible evidence prior to March 14, 2005, was severe impairment of social and industrial adaptability, active psychotic manifestations of such extent, severity, depth, persistence, or bizarreness, as to produce total social and industrial inadaptability. 38 C.F.R. § 4.132, General Rating Formula for Psychotic Disorders, Diagnostic Code 9203 (1996)(effective prior to November 7, 1996). It is also not shown during that period was that the Veteran's paranoid schizophrenia produced total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. 38 C.F.R. § 4.130, General Rating Formula for Mental Disorders, Diagnostic Code 9203 (2010) (effective from November 7, 1996).

The evidence also does not show that during the period from 1994 to 2005, when a 50 percent rating was assigned, that the Veteran had the requisite symptomatology requisite symptomatology for the assignment of a 70 percent disability rating. Specifically, what was not shown by credible evidence prior to March 14, 2005, that the service-connected schizophrenia alone to produce severe impairment of social and industrial adaptability. 38 C.F.R. § 4.132, General Rating Formula for Psychotic Disorders, Diagnostic Code 9203 (1996)(effective prior to November 7, 1996). Nor, did the credible evidence show that the service-connected paranoid schizophrenia alone was productive of occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); and inability to establish and maintain effective relationships. 38 C.F.R. § 4.130, General Rating Formula for Mental Disorders, Diagnostic Code 9203 (2010) (effective from November 7, 1996).

What was in fact shown between 1991 and 2005 as being attributed to the service-connected paranoid schizophrenia, was nothing more than mild symptomatology in the face of an ever-worsening nonservice-connected dementia. The cognitive symptomatology of the worsening dementia was readily distinguishable by a competent medical professional, Dr. R.J.B.

The Board acknowledges that Dr. R.T., diagnosed active schizophrenia in the November 1994 private examination report. This report indicated that the Veteran's symptoms had "increased drastically in the last one or two years." Dr. R.T. also indicated that treatment was indicated, but that based upon the lack of treatment for the past half century, improvement was improbable. This report shows active symptoms of schizophrenia that had recently increased. However, the evidence of record had established that the Veteran had a history of schizophrenia dating back to 1943 which was untreated for half a century. To the extent that this report shows an increase in symptoms, the Board notes that an increased disability rating, from noncompensable to 50 percent, was awarded and accurately reflects the symptoms noted in this examination report. 

In contrast, the VA examiner who examined the Veteran less than one year later in June 1995, specifically noting Dr. R.T.'s findings, found that the Veteran had no major psychiatric symptoms with any evidence of schizophrenia. Thereafter, during the August 1997 VA examination, the Veteran was documented as having a depressed affect and being resigned to the problems of growing older. It was not indicated, however, that he manifested any of the foregoing criteria for the assignment of either a 70 or 100 percent disability rating. In fact, the examiner found him to be functioning at the GAF level of 70 under Axis V. This same level had been documented during the earlier June 1995 VA examination, and was consistent with the findings of Dr. R.J.B. in his 2006 addenda when he assigned a GAF of 65 due solely to the service-connected schizophrenia.

GAF scores ranging from 61 to 70 reflect some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, and has some meaningful interpersonal relationships. American Psychiatric Association's DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 1994).

Thus, prior to March 14, 2005, with the exception of the November 1994 report, the mental health examiners who evaluated the Veteran have consistently indicated that the limitations and symptoms resulting from the Veteran's psychiatric disability alone are only mild with some difficulty in social and occupational functioning. This level of disability clearly does not approach or approximate the requisite pathology for either the 70 or 100 percent disability rating.

The Court specifically requested the Board to address the medical evidence provided by Dr. S.L.M who is the Clinical Psychologist who conducted an April 2005 private psychological evaluation of the Veteran. Ultimately this examiner diagnosed the Veteran with schizophrenia, residual type, on Axis I, and mild retardation on Axis II. After a full review of the evidence the examiner noted the presence of significant mental deficiency / cognitive disorder and considered a diagnosis of dementia. The diagnosis of dementia was ultimately ruled out as the evidence showed cognitive impairment throughout the Veteran's entire life. This report also noted that the Veteran, due to his age, may have an additional dementia process on top of his mental retardation and schizophrenia. A GAF assigned was 35.

In December 2006, Dr. S.L.M. offered a report of Psychological Evaluation that was in response to a request from the Veteran's attorney to state "explicitly when [the Veteran] started displaying the symptoms that warrant a 100 percent rating." In this report, Dr. S.L.M. indicated that her sources of information were the clinical interview of the Veteran and his spouse, psychological testing, letters from the Veteran's attorney, the December 2005 rating decision, and all information gathered for the April 2005 psychological evaluation. Significantly, this report does not address the VA examinations during the applicable period of time which showed that the Veteran's schizophrenia was in remission. Following a mental status examination and psychological testing, the diagnostic impression on Axis I was schizophrenia, residual type (paranoid), and rule-out dementia. The impression on Axis II was mild mental retardation. The GAF assigned was again 35. In summation of her findings, Dr. S.L.M. first discussed the criteria for a 100 percent disability evaluation under the VA rating schedule. She then indicated that she was not surprised that the current evaluation showed no change in the Veteran's cognitive and emotional functioning since April 2005, given the chronic nature of his symptoms. She noted that, as described in the April 2005 evaluation, the Veteran was incapable of working due to his psychological status since at least the early 1950's, having been supported initially by his parents and then by his wife since their marriage in 1976. Dr. S.L.M. noted that the Veteran's wife described moderate to severe impairment from at least the 1970's and that the Veteran was declared partially disabled by VA in the 1990's. The Board has already found the wife's reports of the Veteran's symptoms to lack credibility. She then noted that the private evaluation performed by Dr. R.T., Ed.D. in 1994 showed a prominent thought disorder, significant distractibility, and impaired recent and remote memory, findings that Dr. S.L.M. stated had been replicated each time that the Veteran had been evaluated since. Dr. S.L.M. concluded that it was her belief, based upon all available reports and knowledge regarding the chronic nature of both schizophrenia and mental retardation, that the Veteran began displaying the symptoms to warrant a 100 percent disability rating at least as early as 1994. 

The Board acknowledges that this report is competent and credible. It is also consistent with Dr. S.L.M.'s prior April 2005 examination findings and with the findings of the November 2005 VA examination. This report is of less probative value than the evidence provided by Dr. R.J.B. in the November 2005 VA examination report and the July and November 2006 addenda, however. It is of less probative value because it does not account for evidence of record during the period of time in question that clearly shows the Veteran's service-connected schizophrenia was diagnosed as being in remission. It is of less probative value in that it also does not differentiate, or even attempt to differentiate, between the Veteran's service-connected schizophrenia and the nonservice-connected mental deficiency (mental retardation and/or dementia). This report is consistent with Dr. S.L.M.'s own prior April 2005 examination report and the 2005 VA examination report showing total impairment as evidenced by a GAF of 35. But again, all three of these consider both the service-connected schizophrenia and nonservice-connected mental deficiency in determining that the Veteran is 100 percent disabled prior to 2005. Only the well reasoned addenda by Dr. R.J.B. manage to separate out the disability level resulting solely from the service-connected schizophrenia. 

Dr. S.M.L. relied heavily upon the 1994 evaluation of Dr. R.T., expressly stating that Dr. R.T.'s evaluation "showed a prominent thought disorder, significant distractibility, and impaired recent and remote memory, findings that have been replicated each time [the Veteran] has been evaluated since." The problem with this premise is that it is not true as it relates to the pathology associated solely with the Veteran's service-connected paranoid schizophrenia. These pathological findings were not, in fact, specifically replicated in each subsequent examination. When cognitive impairment was shown, it was more prominently associated either with the Veteran's nonservice-connected mild mental retardation or ever- worsening dementia. Significantly, this phenomenon has been adequately and fully explained by the well-reasoned opinions of Dr. R.J.B. It is probative to also note that Dr. S.M.L. totally discounted other considerations for the Veteran's impairment, not the least of which was his significant non-service-connected cognitive disabilities which Dr. S.M.L. has established as long standing mental retardation with possible recent overlay of dementia. 

For these reasons, the opinions offered by Dr. R.J.B. with respect to the pathology associated with the Veteran's service-connected paranoid schizophrenia are entitled to greater probative value. See Owens v. Brown, 7 Vet. App. 429, 433 (1995) (holding that it is not error for the Board to favor opinion of one competent medical expert over that of another when the Board gives adequate statement of reasons and bases). His medical opinions as well as the contemporaneous medical records upon which they were based clearly stands against a finding that the pathology associated with the Veteran's paranoid schizophrenia met or approximated the criteria for a 100 percent rating under either the previous or amended criteria at any time prior to March 14, 2005. The preponderance of the evidence being against the claim, the benefit of the doubt doctrine does not apply, and an effective date earlier than March 14, 2005 for the assignment of a 100 percent rating is not warranted.


V. Extraschedular Consideration

The Board has also considered whether an earlier effective date for a 100 percent disability evaluation was warranted on an extra-schedular basis. In exceptional cases where evaluations provided by the Rating Schedule are found to be inadequate, an extra-schedular evaluation may be assigned which is commensurate with the Veteran's average earning capacity impairment due to the service-connected disability. 38 C.F.R. § 3.321(b).

The record does not show that the RO expressly considered referral of this case to the Chief Benefits Director or the Director, Compensation and Pension Service, for the assignment of an extraschedular rating under 38 C.F.R. § 3.321(b)(1). The Court has held that the Board does not have jurisdiction to assign an extraschedular rating under 38 C.F.R. § 3.321(b)(1) in the first instance. Floyd v. Brown, 9 Vet. App. 88 (1996).

However this does not preclude the Board from concluding, on its own, that a claim did not meet the criteria for submission pursuant to the regulation. See Bagwell v. Brown, 9 Vet. App. 337 (1996); VAOPGCPREC 6-96. The Court has also held that the Board must only address referral under § 3.321(b)(1) when exceptional or unusual circumstances are present. Shipwash v. Brown, 8 Vet. App. 218, 227 (1995).

It has been contended that the Veteran is unemployable due to his paranoid schizophrenia, and the record shows that he has been unemployed for many years. Nonetheless, the Board is of the opinion that the Veteran has not submitted evidence indicating that his service-connected paranoid schizophrenia disability affects his employability in ways not contemplated by the Rating Schedule, whose percentage ratings represent the average impairment in earning capacity. 38 C.F.R. § 4.1.

The mere assertion that a disability interferes with employment or renders a Veteran unemployable does not automatically raise or implicate the assertion that the regular schedular standards are not adequate and therefore require consideration of section 3.321(b). See VAOPGCPREC 6- 96.

In addition, the Veteran has not presented a disability picture so unusual or exceptional as to render impractical the application of the regular schedular standards. While the evidence shows that he has not been employed, the probative evidence does not establish that this lack of employment has been solely due to the Veteran's service-connected schizophrenia as opposed to his nonservice-connected mental deficiency or other reasons (the Veteran has been found unemployable for pension purposes as early as 1986 due to his advanced age and lack of practical work experience). Furthermore, the evidence does not indicate that the paranoid schizophrenia disability has resulted in frequent hospitalizations or inpatient care. In fact, the evidence indicates that he has never received any treatment for his service-connected mental disorder in the past half century. 

Referral in this instance was therefore not warranted because the evidence does not indicate that the service-connected paranoid schizophrenia disability had rendered the Veteran's disability picture unusual or exceptional, markedly interfered with employment, or required frequent inpatient care as to render impractical the application of regular schedular standards, so as to afford the Veteran an effective date prior to March 14, 2005, for the assignment of the 100 percent rating.

Finally, the Veteran is represented by an attorney who has not argued that a 100 percent disability evaluation was warranted on an extra-schedular basis. 


ORDER

Entitlement to an effective date earlier than March 14, 2005, for the grant of a 100 percent disability evaluation for schizophrenia, paranoid type, is denied.





____________________________________________
RONALD W. SCHOLZ 
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs